IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

In Re:                          §
                                §
CINDY ANN HILMES                §
                                §
     Debtor                     §
                                §
UNITED STATES TRUSTEE           §
                                §   CIVIL ACTION NO. 4:09-CV-732-Y
     Appellant                  §
                                §
vs.                             §
                                §
CINDY ANN HILMES                §
                                §
     Appellee                   §

ORDER REVERSING AND REMANDING
BANKRUPTCY COURT'S DENIAL OF TRUSTEE'S MOTION TO DISMISS

Before the Court is the appeal of the United States Trustee
("the Trustee") in this chapter 7 case. The Trustee appeals the
bankruptcy court's denial of his motion to dismiss this case for
abuse under 11 U.S.C. § 707(b)(3). After review, the Court concludes
that the bankruptcy court applied an erroneous standard in ruling on
the Trustee's motion to dismiss under section 707(b)(3)(B) and failed
to properly consider a number of relevant factors highlighted by the
Trustee. Additionally, the Court concludes that the bankruptcy court
did not separately consider the Trustee's arguments for dismissal
under section 707(b)(3)(A). Accordingly, the bankruptcy court's
ruling will be reversed and remanded.

I. Background

At the time of the appeal, debtor Cindy Hilmes was fifty-one
years old. She is well educated; she holds bachelor's degrees in
architecture and psychology, and an associate's degree in interior
design. Hilmes has one child, a teenage daughter, who lives with

her.  Hilmes has been consistently well employed over the last five years.  As a manager for Sabre Holdings, Hilmes earned $118,000 in 2008 and $123,000 in 2009.  This income is more than double the median income for a family of two in Texas, according to the Bureau of the Census.  Hilmes is also eligible for significant annual bonuses.  In 2007, Hilmes received a bonus of $15,624.  And Hilmes has accumulated significant retirement funds.  Hilmes has $158,669.48 in her retirement accounts and continues to make monthly voluntary contributions to her 401k of $1,652.49.  (Tr. Trans., doc. #36, at p. 101; Doc. #1, Sched. B, Sched. I.)[1]

Evidence was presented to the bankruptcy court regarding Hilmes's expenditures and spending habits.  Hilmes's daughter attends a private school, as well as a supplemental educational program, at an annual combined cost of $13,350.  But Hilmes explains that her daughter suffers from multiple learning disabilities, and that these programs are necessary for her daughter to advance appropriately in her education.  The Trustee also presented evidence that Hilmes went on three trips in 2008.  One of these trips was to Phoenix, Arizona, and Hilmes explains that rather than leisure, the trip was to visit a terminally ill friend.  Hilmes also went to Rhode Island, which Hilmes explains was to visit her parents and to personally assess the Rhode Island real-estate market, as Hilmes had invested in property there.  The Trustee also highlighted expenses for medical procedures for Hilmes and her daughter that might be characterized as elective

---

[1]  Unless otherwise indicated, "doc. #" refers to the document number on the bankruptcy court's docket for cause number 09-42301.

or cosmetic. For example, Hilmes has paid for breast-augmentation surgery for both herself and her daughter. And Hilmes has undergone gastric-bypass surgery. But Hilmes explains that she was suffering from health issues due to her weight, and thus her doctor recommended the bypass surgery. Hilmes further explains that the surgery on her breasts was necessary to correct implants she received a number of years ago, and that her daughter's surgery was necessary to correct abnormal growth of her breasts.

But while Hilmes offers reasonable explanations for some of her expenses that might otherwise be considered unessential, other expenses highlighted by the Trustee paint a picture of a rather extravagant lifestyle. For instance, Hilmes took a third trip in 2008 to Florida and New Orleans. Hilmes explains it was her custom to take a vacation with her daughter each year. This is representative of Hilmes's spending habits generally. Rather than make sacrifices to account for more important expenditures, such as her daughter's education, Hilmes continued to spend on luxuries like out-of-state vacations.

Hilmes also leased two BMW automobiles in 2008, one for herself and one for her daughter. Hilmes pays $639.25 per month for her new BMW 528i herself and pays $484.79 per month for a new BMW 328i for her teenage daughter. In her brief on appeal, Hilmes justifies her leasing of a BMW by explaining that she "has been driving nice vehicles such as BMWs for a long time," hardly a justification for doing so in the context of Hilmes's overall finances. And Hilmes explains that a new BMW was appropriate for her teenage daughter

3

because of concerns for maintenance, safety, and reliability. As the bankruptcy court recognized, safe and reliable vehicles are available for roughly half the monthly expense. (Ruling Trans., doc. #35, at p.5.)

In 2006 Hilmes commissioned the construction of a home, selecting certain custom features, for approximately $500,000. (Tr. Trans., doc. #36, at p.11-12.) Only she and her daughter live in the home. Yet the home is 3,800 square feet and includes four bedrooms, three bathrooms, a pool, a three-car garage, and a media room. (*Id.* at p.10.) Hilmes now pays $3,888.76 in monthly mortgage expense, consisting of a $3,155 payment for the primary mortgage and a $733.76 payment on a secondary mortgage. In her schedule J, Hilmes discloses that her monthly utility expense is $400. (Doc. #1, sched. J.) By comparison, the IRS Local Standards for housing and utilities for a family of two in Denton County, Texas, where Hilmes lives, is $1,769. Thus, Hilmes is incurring well over double the monthly IRS standard expense for housing and utilities.

Another of Hilmes's expenditures that is particularly notable is her purchase of a residential property in Rhode Island ("the Rhode Island property"). In 2005, Hilmes purchase a three-level Victorian-style house in Rhode Island with her sister for $310,000. (Tr. Trans., doc. #36, at p.14. 28, 117, 120.) Hilmes purchased the Rhode Island property based on her sister's advice that such properties were being purchased, renovated, and quickly sold for a profit. Hilmes never saw the house before the purchase, instead purchasing the house through her sister, to whom she gave a power of attorney.

4

Hilmes and her sister were unable to sell the house and the adjustable rate on the mortgage began to rise. Eventually, Hilmes refinanced to avoid the increasing interest, and she did so in her name only. By September 2008, Hilmes's sister informed her that she would no longer be assisting with mortgage payments. (*Id.* at 120.)

By early 2009, Hilmes could no longer keep up with her debt payments and filed for chapter 7 bankruptcy. On July 20, 2009, the Trustee filed his motion to dismiss. Generally, the Trustee argued that Hilmes's chapter 7 petition should be dismissed under 11 U.S.C. § 707(b)(3) because her financial difficulties are due to extravagant consumer spending, rather than an unforeseen event. The Trustee further argued that Hilmes could obtain some bankruptcy relief while paying at least some of her unsecured debt under a chapter 13 plan. In particular, the Trustee argues that Hilmes's housing and vehicle expenses and her retirement contributions are excessive and not reasonably necessary. The bankruptcy court, however, disagreed and denied the motion to dismiss. The Trustee then filed this appeal, raising the four appellate points discussed below.

II. Discussion

A. Standard of Review

A bankruptcy court's ruling on a motion to dismiss for abuse under 11 U.S.C. § 707(b) is reviewed for abuse of discretion. *See Price v. U.S. Tr. (In re Price)*, 353 F.3d 1135, 1138 (9th Cir. 2004); *see also Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004); *In re O'Connor Int'l, Inc.*, No. H-05-02245, 2006 U.S. Dist.

LEXIS 98516, at *1-*2 (S.D. Tex. Feb. 23, 2006) (citing *In re Atlas Supply Corp.*, 857 F.2d 1061, 1063 (5th Cir. 1988)).  "A bankruptcy court abuses its discretion when it "(1) applies an improper legal standard or . . . (2) rests its decision on findings of fact that are clearly erroneous." *Caplin & Drysdale Chartered v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 526 F.3d 824, 826 (5th Cir. 2008).

A district court reviews a bankruptcy court's findings of fact for clear error.  Bankr. R. 8013; *Matter of Missionary Found. of Am.*, 818 F.2d 1135, 1142 (5th Cir. 1987).  "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed.'" *Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 712 F.2d 206, 209 (5th Cir. 1983) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Conclusions of law by the bankruptcy court, as well as mixed questions of law and fact, are subject to de-novo review.  *See AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 402 (5th Cir. 2001).  Errors committed by a bankruptcy court in ruling on a motion to dismiss under section 707(b) are apparently subject to harmless-error review.  *See In re Kohn*, 87 B.R. 926, 930 (N.D. Ohio 1988).

    B.  Analysis

        1.  Did the Bankruptcy Court Err in Using "Substantial Abuse" as the Standard for Dismissal Under 11 U.S.C. § 707(b)(3)(B)?

The Trustee argued that this chapter 7 case should be dismissed for abuse under section 707(b)(3)(B), and now argues that the

bankruptcy court erred by requiring proof of "substantial" abuse. This Court reviews de novo the issue of whether the bankruptcy court applied the correct legal standard in ruling on the motion to dismiss. A chapter 7 case filed by an individual debtor whose debts are primarily consumer debts may be dismissed if the court finds that granting bankruptcy relief would be an abuse of chapter 7's provisions. *See* 11 U.S.C. § 707(b)(1). Under section 707(b)(3)(B), in considering whether granting relief would be an abuse in a case in which the presumption of abuse does not arise due to application of the "means test" of section 707(b)(2), the court shall consider whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." In announcing its decision, the bankruptcy court stated, after reviewing evidence of Hilmes's spending habits, that Hilmes "just doesn't strike the Court [as having] the type of mentality that Congress was trying to address when it instructed courts to dismiss cases for substantial abuse." (Ruling Trans., doc. #35, at p.11.)

The Trustee argues that this statement shows that the bankruptcy court committed error by requiring *substantial* abuse, rather than simple abuse as stated in section 707(b)(3)(B). As originally enacted in 1984, section 707(b) authorized dismissal of a chapter 7 petition where granting relief would be a "substantial abuse." *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, § 312, 98 Stat. 333, 355. In 1986, the section was amended to authorize the United States trustee to seek dismissal for substantial abuse. *See* Bankruptcy Judges, United States Trustees,

and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 990554, § 219, 100 Stat. 3088, 3101. Most critical to the issue now on appeal, in 2005 the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") was enacted. Pub. L. No. 109-8, 119 Stat. 23. As part of this act, subsection 707(b)(3)(B) was created and Congress removed the word "substantial" from the standard for dismissal.

According to the Trustee, this reflects a lowering of the standard for dismissal; and the bankruptcy court, by requiring a showing of substantial abuse in this case, committed legal error. Hilmes, on the other hand, argues that the bankruptcy court referred to substantial abuse only once in its opinion, and that this Court should not find error based on what may have been a slip of the tongue the court's oral announcement of its ruling. Hilmes further argues that, even assuming the bankruptcy court applied substantial abuse as the standard in ruling on the Trustee's motion, the bankruptcy court's ruling should be upheld because there is no practical difference between abuse and substantial abuse.

As for Hilmes's first point, it is true that the bankruptcy court referred to substantial abuse only once in its ruling. But this is the only reference to section 707(b)'s abuse standard at all in the ruling. Simply put, the bankruptcy court recited the abuse standard once, and in that single recitation it erroneously described that standard as requiring substantial abuse, rather than merely abuse.

Moreover, the bankruptcy court's ruling was highly deferential to Hilmes. The bankruptcy court describes Hilmes's expenditures on

her home and care as expensive and excessive, describes her consumer-spending habits generally as excessive, states that many of her expenditures are "not very defensible," characterizes Hilmes as "living on the edge," observes that Hilmes has treated discretionary items as necessary, notes Hilmes's overindulgence of her daughter and that, generally, Hilmes simply has a "habit to incur a lot of consumer debt." (Ruling Trans., doc. #35, at p. 4-6, 9-11.) Yet the bankruptcy court still denied the motion to dismiss, strongly suggesting that it was looking for something more than simple abuse.

And, with regard to Hilmes's second argument, this Court cannot say that the bankruptcy court's apparent requirement of substantial abuse had no impact on its ruling. Or, in the parlance of appellate law, that the bankruptcy court's application of the an incorrect legal standard was not harmless. *See* Fed. R. Civ. P. 61; 28 U.S.C. § 2111; *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000) (citing *Orellana v. Kyle*, 65 F.3d 29, 33 (5th Cir. 1995) (application of incorrect legal standard harmless if conclusion unchanged)). Hilmes argues that omission of "substantial" from section 707(b)(3)(B) had a very small impact, if any, on abuse dismissal. As the portion of Collier on Bankruptcy cited by Hilmes explains "[f]ew, if any courts, permitted a case to go forward under prior law if they found it abusive. The general view appeared to be that any abuse was substantial and grounds for dismissal." 6 Collier on Bankruptcy ¶ 707.05[3][b].

But Collier's observations notwithstanding, generally, when Congress omits from a statute language it has previously included, it

is presumed that such omission was intentional and purposeful. *Cf. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted). And the history of BAPCPA supports the Trustee's arguments that Congress's omission of "substantial" from section 707(b)(3)(B) was purposeful, and that the purpose was to ensure that debtors repay their creditors to the maximum extent possible. *See* 146 Cong. Rec. S11700 (Dec. 7, 2000) *available at* http://www.gpoaccess.gov (stating that BAPCPA was enacted "to assure that in practice those with the ability to pay would not be entitled to chapter 7 relief"); *see also* 151 Cong. Rec. S1856 (Mar. 1, 2005) (remarks of Sen. Grassley, stating that "if repayment is possible, then [under BAPCPA, a debtor] will be channeled into chapter 13 of the Bankruptcy Code which requires people to repay a portion of their debt"); *cf. In re Hardacre*, 338 B.R. 718, 725 (Bankr. N.D. Tex. 2006) (citing 151 Cong. Rec. S2470 (March 10, 2005) and stating the Congressional intent behind BAPCPA was to "ensure that those [debtors] who can afford to repay some portion of their unsecured debts [be] required to do so"). As Senator Grassley stated in explaining the history and need for BAPCPA, "since the standard for dismissal is revised to require 'abuse' rather than 'substantial abuse,' the courts are clearly given additional discretion to control abusive use of chapter 7." 146 Cong. Rec. S11700 (Dec. 7, 2000). Indeed, contrary to Hilmes's

argument that the omission of "substantial" effects little if any change to the meaning of section 707(b)(3)(B), courts have recognized the omission as part of a "sea change" produced by BAPCPA. *See Egebjerg v. Anderson (In re Egebjerg)*, 574 F.3d 1045, 1048 (9th Cir. 2009). More specifically, courts have recognized that by omitting "substantial," Congress lowered the standard for dismissal for abuse under section 707(b)(3)(B). *See In re Tucker*, 389 B.R. 535, 538 (Bankr. N.D. Ohio 2008) ("Congress has clearly lowered the dismissal standard" by changing it from substantial abuse to abuse); *also cf. In re Bradley*, 103 B.R. 758, 760 (Bankr. E.D. Va. 1989) (stressing that to dismiss under former section 707(b) the abuse must be substantial); *In re Adams*, 206 B.R. 456, 462 n.6 (Bankr. M.D. Tenn. 1997) (discussing *In re Higuera*, 199 B.R. 196, 199-200 (Bankr. W.D. Okla. 1996)).

In denying the motion to dismiss, the bankruptcy court stated that it was "a very, very close call." (Ruling Trans., doc. #35, at p. 12.) And, as discussed below, various factors not considered by the bankruptcy court suggest granting chapter 7 relief to Hilmes is an abuse of that chapter. Hence, this Court cannot say that the bankruptcy court's application of the wrong standard was harmless.

> 2. Did the Bankruptcy Court Abuse its Discretion in Failing to Consider Certain of Hilmes's Expenditures?

The Trustee also complains that the bankruptcy court abused its discretion by not adequately taking into consideration Hilmes's monthly contribution to her 401k or her mortgage payment. As noted, Hilmes contributes $1,652.49 a month to her 401k. Of this, $663.84 is used to repay a loan taken by Hilmes from her 401k while the

11

remainder adds to Hilmes's retirement funds.  The record shows that
Hilmes earns approximately $6,300 in net income a month.  Thus,
Hilmes is expending over 26% of her monthly net income on the wholly
discretionary endeavor of contributing to a retirement account.

Prior to BAPCPA, courts considered discretionary contributions
to retirement funds in determining whether granting chapter 7 relief
would amount to substantial abuse.  *See*, *e.g.*, *In re Rathbun*, 309
B.R. 901, 905 (Bankr. N.D. Tex. 2004); *see also In re Watkins*, 216
B.R. 394, 396 (Bankr. W.D. Tex. 1997) (concluding debtors' $1,099 per
month in voluntary retirement contributions were unreasonable).  As
one court in this circuit has explained, "[a] debtor's voluntary
payment into a pension, savings, retirement, or investment type plan
is not a reasonably necessary expenditure for a debtor's maintenance
and support."  *In re Rathbun*, 309 B.R. at 905.  "Such deferred income
should be available to pay current debts" as doing so does not
deprive the debtor of life's necessities.  *See id.*

BAPCPA was meant to refine the abuse standard under section
707(b) and to give courts more discretion to find cases abusive.  *See
In re Kelly*, 841 F.2d 908, 916 (9th Cir. 1988) (noting the lack of a
definition of "substantial abuse"); *see also* 146 Cong. Rec. S11700
(Dec. 7, 2000).  Section 707(b)(3)(B) now provides that a case should
be dismissed if the totality of the circumstances of the debtor's
financial situation demonstrates abuse.  Courts have continued to
consider discretionary contributions to a retirement in evaluating
whether a case is abusive post-BAPCPA.  *See In re Tucker*, 389 B.R.
535, 539-41 (Bankr. N.D. Ohio 2008) (discussing consideration of

voluntary retirement contributions post BAPCPA); *see also In re Lenton*, 358 B.R. 651, 663-66 (Bankr. E.D. Penn. 2006).

Many pre-BAPCPA cases applied a per-se rule that discretionary contributions to a retirement plan are never a reasonably necessary expense. *See In re Beckerman*, 381 B.R. 841, 846-47 (Bankr. E.D. Mich. 2008). Since BAPCPA, an increasing number of courts have opted for a case-by-case determination as to whether such contributions are reasonably necessary. *See id.* at 846. Even accepting this trend, Hilmes's 401k contributions and repayment of her 410k loan should have been considered. Cases in which retirement contributions were found necessary dealt with debtors with relatively little retirement funding, who were contributing a relatively small portion of their monthly income to retirement planning, who had a relatively short remaining work life, or whose circumstances otherwise justified setting aside funds for retirement. *Cf. id.* at 846-49. Hilmes, on the other hand, is only fifty-one-years old and anticipates working for fifteen more years, is making an annual salary of well over $100,000, has accumulated $158,669 in retirement funds, and has only one dependent. (Tr. Trans., doc. #36, at p. 100-102; Appellee's Br. at 13.) And Hilmes is contributing over $1,600 per month, or more than a quarter of her monthly net income, to her 401k account. Yet the bankruptcy court's ruling makes no mention of these contributions and does not show how, or whether, that ruling takes these contributions into consideration. Contribution of over a quarter of one's net monthly income, essentially deferring that income for later use by the debtor while avoiding payment of current debt, is a factor

worthy of careful consideration, and is one that, in this Court's opinion, suggests abuse. *See In re Tucker*, 389 B.R. 535, 539-41 (Bankr. N.D. Ohio 2008) (discussing consideration of voluntary retirement contributions post BAPCPA); *see also In re Lenton*, 358 B.R. 651, 663-66 (Bankr. E.D. Penn. 2006). And this is so notwithstanding the fact that a portion of Hilmes's contribution to her 401k is to repay a loan. By paying off her 401k loan, Hilmes is essentially repaying herself while discharging her other debts. *See In re Rathbun*, 309 B.R. at 905.

Hilmes argues that in filling out official form 22A for purposes of the "means test" of section 707(b)(2), she did not claim her 401k contribution as an expense. Thus, the contributions had no impact on the calculation of her disposable income. But, as is clear by the section's language and structure, the means test of section 707(b)(2) and dismissal for abuse under section 707(b)(3) are separate analyses. *See Ross-Tousey v. Neary (In re Ross-Tousey)*, 549 F.3d 1148, 1161-62 (7th Cir. 2008) (stating that despite a ruling that allowed the debtor to take a deduction that reduced the debtor's income below the presumptively-abusive level under the means test, the trustee could still seek dismissal for abuse under section 707(b)(B)(3)); *see also In re Daugherty*, 416 B.R. 582, 586 (Bankr. N.D. Tex. 2009) (describing 707(b)(3) as "an alternative basis for judging abuse" from the means test). A court must, of course, take care not to merely substitute its subjective judgment regarding a debtor's finances under section 707(b)(3) and thereby effectively render the means test superfluous. *See In re Nockerts*, 357 B.R. 497,

507-08 (Bankr. E.D. Wis. 2006). Nevertheless, by its terms, section 707(b)(3) applies as an alternative basis for dismissal when a presumption of abuse does not arise under the means test or is rebutted by special circumstances. *See* 11 U.S.C. § 707(b)(3). And as discussed, the purpose of section 707(b)(3)(B) is to give courts greater discretion to dismiss a case that, although not abusive under section 707(b)(2)'s mechanical means test, is shown to be abusive based on its particular facts and circumstances. *Cf. id.* at 507 (stating that debtors may avoid the presumption of abuse under the means test by taking allowed deductions for debt secured by luxury items but still have their case dismissed as abusive under section 707(b)(3)). Thus, however Hilmes's 401k contributions are treated under the means test, they are a proper consideration under section 707(b)(3)(B)'s abuse analysis.

The Trustee also complains that the bankruptcy court did not consider Hilmes's monthly mortgage expenses in assessing the existence of abuse. But the bankruptcy court, at least to some extent, did consider the mortgage expense. Citing the formulation of the totality-of-the-circumstances test for abuse articulated in *In re Daugherty*, the bankruptcy court observed that excessiveness of the debtor's budget bears on whether relief would be an abuse of chapter 7. (Ruling Trans., doc. #35, at p. 4.) The bankruptcy court stated that the issue of excessiveness in Hilmes's case largely turned on her mortgage payment and car payments. (*Id.*) The bankruptcy court acknowledged that the house is expensive and large for two people, but stated that this "is not the be-all and end-all of

excessiveness." (*Id.*) Further, the bankruptcy court stated that Hilmes purchased the house "at a time when she had the ability to do so." (*Id.*) Finally, with regard to the house, the bankruptcy court stated that "[i]n light of the fact that the Debtor has been trying to get out of the house for some three years now, it's hard to hold that against her." (*Id.* at 6.)

This Court would note, however, that Hilmes's efforts to sell the house appear somewhat languid. Hilmes listed the house for sale at $524,000 despite listing the property as being worth $500,000 on her bankruptcy schedules and despite the historic downturn in the real-estate market that has taken place since she purchased the home, apparently in an attempt to recoup her full investment and realtor expenses. (Tr. Trans., doc. #36, p. at 13; Doc. #1, sched. A.) Hilmes has never had the house appraised, apparently out of fear it will be valued at less than $500,000. (*Id.*)

Moreover, this Court questions whether it can be said that Hilmes's 2006 purchase of a 3,800 square foot custom-built home valued at $500,000 was at a time when she could afford it, at least as part of a reasonable and responsible budget. The bankruptcy court discusses in its ruling as some justification for Hilmes's spending habits the fact that both the government and the credit industry encourage consumers to borrow and spend. (Ruling Trans., doc. #36, at p.8-10.) The bankruptcy court also notes that it sees many debtors who live a lifestyle that includes unnecessary luxury items, such as a nice house and nice cars, and who do so by living on cash flow, rather than budgeting. (*Id.* at 4, 8.) Further, the bankruptcy court

observed that Hilmes simply had a habit of incurring a large amount of consumer debt, and that Hilmes has a daughter whom Hilmes herself admits is overindulged. (*Id.* at 11.) But rather than public and private influences on consumer spending and any societal trend for overindulgence, section 707(b)(3)(B) requires a court to consider the circumstances "of the *debtor's* financial situation." 11 U.S.C. § 707(b)(3)(B) (emphasis added). BAPCPA was enacted to "respond to many of the factors contributing to the increase in consumer bankruptcy filings, such as a lack of personal financial accountability . . . ." *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 371 (3d Cir. 2007) (quoting H.R. Rep. No. 109031, at 2 (2005)). As part of the abuse analysis, courts consider whether the debtor filed her petition as a result of a calamity, disability, unemployment, or sudden unexpected illness. *See In re Watkins*, 216 B.R. 394, 396 (Bankr. W.D. Tex. 1997); *see also Grogan v. Garner*, 498 U.S. 279, 287 (1991) (stating that bankruptcy is meant to protect the "honest but unfortunate debtor"). Hilmes justifies her purchase of a 3,800 square foot house for two people by explaining that she wanted to have a place for her daughter to entertain friends. (Tr. Trans., doc. #36, at p.114.) This, coupled with Hilmes's other extravagant expenditures, is not characteristic of a financially responsible but unfortunate debtor. Yet, while the bankruptcy court credits Hilmes for attempting to sell the house, neither Hilmes's constraints on the sale nor Hilmes's rather suspect justification for purchasing the house in the first place are discussed.

There is evidence of two events in the record that Hilmes might argue are the sort of calamitous or unforseen event that justifiably gives rise to the filing of a chapter 7 petition. First, Hilmes had received a significant bonus in 2007. She apparently anticipated receiving a bonus in 2008 and spent accordingly. But as a bonus is by its nature not guaranteed, not receiving one can hardly be called calamitous.

Second, Hilmes argues on appeal that although her debts are primarily consumer debts, her financial difficulties relate mainly to her investment in the Rhode Island property, which she jointly purchased with her sister in 2005 for $310,000. Hilmes insists that she and her sister intended to renovate the property and quickly resell it, but a downturn in the Rhode Island real-estate market frustrated that intent. According to Hilmes, the interest on the variable-rate mortgage on the property started to rise, making it more difficult to service the mortgage. Hilmes refinanced the mortgage to avoid the rising interest and did so in her name only because of issues with her sister's credit. Hilmes insists that the fact that she is now, in connection with the Rhode Island property, solely responsible for monthly payments of $1,765.13 for the primary mortgage and $538.69 for a secondary mortgage, as well as $628.84 per month for taxes and interest is what caused her to file for chapter 7 relief.

In its only reference to the Rhode Island property, the bankruptcy court finds credible Hilmes's testimony that her sister's abandoning any financial responsibility with regard to the property

put Hilmes in an unanticipated financial situation. Of course, the bankruptcy court's fact findings are subject to review for clear error, and its assessment of witness credibility is particularly entitled to deference. Even so, the evidence before the Court is that Hilmes freely entered into a joint obligation with her sister in purchasing the Rhode Island property. (Tr. Trans., doc. #36, at p. 14, 117.) Thus, she has apparently been liable for the full amount of the original mortgage since the purchase of the Rhode Island property. *See* Restatement (2d) of Contracts, § 289(1) ("Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof, whether his duty is joint, several, or joint and several."). And the need to refinance arose only because Hilmes allowed herself to become a party to a mortgage with an adjustable rate. This was not a surprise or unforeseen, but was a voluntary investment decision. While Hilmes's good faith in purchasing the Rhode Island property and the fact that her sister has abandoned financial responsibility regarding that property are relevant considerations, so too are these facts. Yet none is recited in the bankruptcy court's ruling.

Further, Hilmes's argument that her bankruptcy was driven by her business losses, rather than her consumer debts, makes little chronological sense. Hilmes purchased the Rhode Island property in 2005 and then, having agreed to be jointly liable for the approximately $300,000 mortgage on that property, purchased her $500,000 home in 2006. And the timing of the purchases aside, even granting to Hilmes that the Rhode Island property was the

metaphorical straw that broke the camel's back, Hilmes's camel was at its breaking point because of her habit for unnecessary consumer spending, not because of her investment property.

Hilmes next counters the Trustee's arguments by pointing out that 11 U.S.C. § 1325(b) provides that in calculating "disposable income," the debtor's current monthly income is reduced by amounts reasonably necessary to be expended. *See* 11 U.S.C. § 1325(b)(2). In turn, for an above-median debtor such as Hilmes, "amounts reasonably necessary to be expended are calculated under section 707(b)(2) subparagraphs (A) and (B). According to Hilmes, because section 707(b)(2)(A)[2] allows mortgage payments as a reasonably necessary expense and because there is no limit imposed by the section for such expense, mortgage payments may not be considered by a court in assessing the presence of abuse.

But, as discussed above, section 707(b)(2) describes what is known as the means test, which a court applies to determine whether a presumption of abuse arises. Section 707(b)(3) is a separate test, meant to provide courts with discretion to deem a case abusive, even if the presumption of abuse does not arise under the means test or is rebutted.

And Hilmes's argument is simply nonsensical. Under Hilmes's position, which is that debt secured under a mortgage is allowed without limitation as reasonably necessary even under section 707(b)(3)(B) and that a court may not consider mortgage payments in

---

[2] Specifically, section 707(b)(2)(A)(iii)(I) allows a deduction "on account of secured debts," such as a mortgage or care payment. *See Morse v. Rudler (In re Rudler)*, 576 F.3d 37, 41 (1st Cir. 2009).

evaluating abuse, a debtor could enter into a mortgage so excessive as to consume all of the debtor's monthly income and yet a court would be powerless to deny chapter 7 relief.  A court's analysis under section 707 (b)(3)(B) is not so limited, however, as courts have recognized that the section allows for "consideration of the debtor's actual income and expenses," notwithstanding what is considered under the means test.  *See In re Ross-Tousey*, 549 F.3d at 1162.

Ultimately, the bankruptcy court erred by relying on the substantial-abuse standard, as opposed to section 707(b)(3)(B)'s current language which simply requires abuse.  This was an abuse of discretion.  *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006) ("[A] court by definition abuses its discretion when it applies an incorrect legal standard," and thus such errors are reviewed de novo.").  And in applying that standard, the bankruptcy court abused its discretion by not considering a number of factors raised by the Trustee.  Hilmes makes contributions and repayments to her 401k which, under both pre- and post-BAPCPA law, is highly relevant to evaluating abuse under section 707(b)(3)(B).  This is particularly so in this case, given the size of Hilmes's monthly contributions relative to her monthly income, the amount of funds Hilmes has already accumulated for retirement, Hilmes's substantial salary and future earning capacity, and the other factors discussed above.  Additionally, although the bankruptcy court discusses Hilmes's mortgage on her residence, it does so only briefly, and in the context of a lament over the encouragement by the government and

the credit industry of dangerous spending habits and the characteristics of debtors generally. The discussion does not take into account many relevant facts, including Hilmes's rather specious explanation for her purchase of such a large house or her languid efforts to sell the house. Moreover, Hilmes cites the developments related to the Rhode Island property as the financial development that precipitated her filing for bankruptcy relief. But Hilmes entered into a joint obligation for this property and was, therefore, always obligated to pay the full amount. And in purchasing the Rhode Island property, Hilmes agreed to the adjustable rate that she later sought to avoid by refinancing. The bankruptcy court's ruling discussed none of these facts. If viewed in combination with Hilmes's other lavish expenditures, such as her luxury cars and travel, a finding of abuse may well be appropriate. *See In re Castellaw*, 401 B.R. 223, 228 (Bankr. N.D. Tex. 2009) (concluding that housing expense that was five times higher than the IRS local standard was excessive and that the debtors' resources devoted to housing should be reallocated to pay creditors); *see also In re Meurer*, No. 09-41446, 2009 Bankr. LEXIS 3633, at *10-*11 (Bankr. N.D. Tex. Nov. 18, 2009) (concluding that chapter 7 relief would be an abuse based, inter alia, on debtor's excessive housing expense, which was almost three times the IRS guideline for the relevant household size).

Accordingly, this Court will reverse the bankruptcy court's ruling on the Trustee's first and third appellate points and remand this case to the bankruptcy court for reconsideration of the

Trustee's motion to dismiss under the abuse standard of section 707(b)(3)(B), taking into account all of the relevant factors, including Hilmes's 401k contributions and her mortgage payments, and whether adjustments can be made to Hilmes's expenses that would enable her to repay her creditors under chapter 13. *See In re Watkins*, 216 B.R. at 396 (finding retirement contributions to be unreasonable and observing that if the retirement contributions were used in a chapter 13 plan, this alone would result in a significant dividend to unsecured creditors); *see also In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007) (discussing "whether the debtor enjoys a stable source of future income" and whether the debtor "is eligible for adjustment of his debts through chapter 13," and "whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities" as relevant considerations under section 707(b)(3)(B)).

> 3.  Did the Bankruptcy Court Improperly Require the Trustee to Show That Hilmes Had the Ability to Repay Creditors Under Chapter 13 Plan?

The Trustee also argues that the bankruptcy court erred by requiring the Trustee, in seeking dismissal for abuse under section 707(b)(3)(B), to show that Hilmes has the current ability to repay her unsecured creditors under chapter 13. Under section 707(b)(3)(B), courts consider the totality of the debtor's circumstances in assessing whether chapter 7 relief would be an abuse. *See* 11 U.S.C. § 707(b)(3)(B); *see, e.g., In re Daugherty*, 416 B.R. at 586-91. Courts have placed particular emphasis on whether the debtor is able to repay creditors under a chapter 13 plan. *See*

*In re Watkins*, 216 B.R. at 396; *see also In re Krohn*, 886 F.2d at 127.  But a debtor's inability to pay under a chapter 13 plan is but one factor to consider, and does not by itself establish that a case is not abusive.  *See In re Krohn*, 886 F.2d 123, 127 (6th Cir. 1989).

In its ruling, the bankruptcy court stated that although it appeared Hilmes would be entitled to some relief under chapter 13, a factor that weighs in favor of granting the Trustee's motion[3], it did not appear that she could make payments to unsecured creditors under a chapter 13 plan.  (Ruling Trans., doc. #35, at p.3.)  The bankruptcy court went on to state, that "[i]f we look at that as being kind of the baseline for ability to pay, then that would suggest that the Debtor doesn't have the ability to pay."  (*Id.*)  Thereafter, the bankruptcy court moves on to address other considerations from *In re Daugherty* bearing on abuse, such as excessiveness of the debtor's budget. (*Id.* at 3-6.)  Consequently, the bankruptcy court's ruling is not based on a requirement that the Trustee show that Hilmes could repay unsecured creditors under a chapter 13 plan.  That ruling is accordingly affirmed to this extent.

> 4.  Did the Bankruptcy Court Abuse its Discretion by Failing to Consider the Trustee's Alternative Argument Under Section 707(b)(3)(A)?

Finally, the Trustee argues that the bankruptcy court abused its discretion by failing to consider his alternative argument for dismissal under section 707(b)(3)(A).  Section 707(b)(3)(A) and 707(b)(3)(B) are alternative bases for dismissing a case as abusive.

---

[3] *See In re Bender*, 373 B.R. 25, 30.

*See* 11 U.S.C. § 707(b)(3) (authorizing dismissal due to the debtor's bad faith in filing the petition or based on the totality of the debtor's financial circumstances).  In assessing bad faith, courts consider factors similar to those considered under section 707(b)(3)(B), but focus on factors such as the circumstances that precipitated the debtor's filing for bankruptcy[4], the debtor's intentions in filing for bankruptcy[5], and whether the debtor has honestly disclosed his financial conditions.[6]

Hilmes argues that she presented evidence that she did not incur additional debt in contemplation of bankruptcy and that her filing for chapter 7 relief was in good faith.  And the bankruptcy court notes in its ruling that Hilmes did not appear to have made excessive purchases in anticipation of bankruptcy, that Hilmes truthfully disclosed her income and expenses, and that Hilmes's explanations for her spending habits, though not always defensible, were credible.  But these facts are mixed in with the bankruptcy court's overall discussion.  There is no clear distinction between the bankruptcy court's analysis under section 707(b)(3)(A) and (b)(3)(B).  In fact, despite the bankruptcy court's discussion of such considerations, it

---

[4] *See In re Mitchell*, 357 B.R. 142 (Bankr. C.D. Cal. 2006) (noting as a relevant consideration whether the debtor's filing for bankruptcy was due to unforeseen event such as illness, disability, or unemployment); *see also In re Colgate*, 370 B.R. 50, (Bankr. E.D.N.Y. 2007) (concluding that debtor's debt resulted from simple overspending, rather than unforseen debt, and thus his filing was in bad faith).

[5] *In re Baum*, 386 B.R. 649 (Bankr. N.D. Ohio 2008) (concluding debtor's filing was not in bad faith because debtor did not incur debt in anticipation of filing for bankruptcy).

[6] *See In re O'Brien*, 373 B.R. 503 (N.D. Ohio 2007) (concluding that debtor's decision to reaffirm significant secured incurred just before filing bankruptcy at the expense of unsecured creditors and false statements on loan applications and bankruptcy schedules showed bad faith);

is unclear if the bankruptcy court considered the Trustee's bad-faith argument in ruling on the motion to dismiss, as Hilmes points to nothing in the ruling that clearly shows the bankruptcy court applied section 707(b)(3)(A) in reaching its decision. On remand, the bankruptcy court should analyze the Trustee's motion to dismiss under section 707(b)(3)(A), and, separately, under section 707(b)(3)(B).

III. Conclusion

Section 707(b)(3)(B) authorizes dismissal of a chapter 7 petition where the totality of the debtor's financial circumstances establish that granting relief would be an "abuse" of the chapter; "substantial" abuse is not required. While the omission of "substantial" post-BAPCPA may be seen by some as semantic and of no practical effect, that does not appear to be what was intended by Congress.

A debtor is not in need of chapter 7 relief "if he can trim an exorbitant budget to fund a chapter 13 plan," *In re Bender*, 373 B.R. at 29, and the ability to fund a chapter 13 plan strongly suggests, and may establish, that a chapter 7 petition is abusive. *See United States Tr. v. Cortez (In re Cortez)*, 457 F.3d 448, 456 n.7 (5th Cir. 2006) (citing cases and noting that some courts have held that a debtor's ability to fund a chapter 13 plan alone can establish abuse, while other courts consider it as a primary factor among multiple factors). Had the bankruptcy court reviewed the Trustee's motion to dismiss under the simple abuse standard, and had it considered all of the factors raised by the Trustee, particularly Hilmes's

discretionary 401k contributions and repayments, it may well have concluded that dismissal or conversion to chapter 13 is appropriate. Further, the bankruptcy court should have separately analyzed the Trustee's argument that Hilmes's filing was in bad faith.

Accordingly, on these points, the bankruptcy court's ruling on the Trustee's motion to dismiss is REVERSED and REMANDED.

SIGNED August 19, 2010.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE